**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ___________________

**ASHLEY NESLADEK**, on behalf of herself and all others similarly situated,

Plaintiff,

v.

**HARBOR GROUP MANAGEMENT CO., LLC,**

Defendant.

---

**CLASS ACTION COMPLAINT AND JURY DEMAND**

---

Plaintiff Ashley Nesladek ("Plaintiff" or "Nesladek"), individually and on behalf of all others similarly situated, through her attorneys, files this Class Action Complaint and Demand for a Jury Trial against Defendant Harbor Group Management Co., LLC ("Harbor Group" or "Defendant") seeking to: (1) stop Harbor Group's practice of charging its tenants unlawful and inflated "junk fees", (2) stop Defendant's practice of charging tenants fees beyond those explicitly authorized by the lease agreements; and (3) obtain damages and other redress for those injured by Harbor Group's conduct. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief.

**Introduction**

1. While Colorado's metro Denver area and other parts of the state suffer from a serious and sustained lack of affordable housing, Harbor Group—"one of the top

50 owners and managers of real estate in the United States"[1]—charges undisclosed, mandatory, and inflated fees to thousands of Colorado tenants that make housing even less affordable.

2. Harbor Group's business strategy has become increasingly common. Over the past several years, powerful and deep-pocketed corporations have grown their profits by packing their lease contracts with misleading, unfair, often hidden, and, at times, unlawful charges—known as "junk fees." These junk fees inflate corporate profits by increasing the costs of daily life for working people.

3. Junk fees also inflate prices and undermine fair competition in the housing market. A healthy housing market should involve corporations competing openly over the true price of their goods and services. Instead, the true cost of housing at a Harbor Group property is inflated through the imposition of fees that are overpriced and not fully disclosed until after a tenant signs a lease and they receive their first monthly bill. Belated disclosure prevents tenants from knowingly consenting to these fees or finding alternate housing elsewhere that does not include these hidden and misleading charges.

4. Rental junk fees have devastating consequences for tenants. By unexpectedly increasing mandatory monthly expenditures beyond advertised rent costs, the imposition of fees for "ancillary services" can unexpectedly push tenants beyond their means.

---

[1] *See* Harbor Group Management "About" page, *available at* https://www.harborgroupmanagement.com/about (last accessed on Oct. 15, 2025).

5. This case challenges three junk fees that Harbor Group imposes on tenants across Colorado: fees for gas service ("Gas Reimbursement Fee"), common area electric service ("Common Area Electric Fee"), and pest control ("Pest Control Fee") (collectively, the "Challenged Fees").

6. The Challenged Fees are not included in the advertised rent and are not adequately disclosed in—or even authorized by—the form leases that Harbor Group imposes on all tenants. Nonetheless, the Challenged Fees are part of the mandatory, monthly cost to rent a Harbor Group apartment.

7. For all these reasons, the Challenged Fees are deceptive, unfair, and unconscionable in violation of the Colorado Consumer Protection Act and covenant of good faith and fair dealing. Because the fees are not authorized for Harbor Group's leases, their imposition also constitutes a breach of contract. Finally, Harbor Group is unjustly enriched through its misconduct.

**Parties**

8. Plaintiff Ashley Nesladek is a resident and citizen of the State of Colorado.

9. Plaintiff Nesladek leased an apartment at 5881 Pierce Street, Arvada, Colorado 80003 ("Arvada Village") from November 25, 2024 to July 25, 2025.

10. Defendant Harbor Group Management Co., LLC ("Harbor Group") is a Virginia limited liability company and a national property management firm for commercial and residential real estate. Its headquarters is in Norfolk, Virginia and its registered agent in Colorado is located at 7700 E Arapahoe Rd, Ste 220, Centennial, Colorado 80112.

11. Harbor Group's sole registered member is HGI Holdings, LLC ("HGI Holdings"), a Virginia limited liability company. HGI Holdings has multiple members, each of which are domiciled and/or maintain their principal place of business in Virginia, New York, and Texas. None of HGI Holdings' members are domiciled or maintain their principal place of business in Colorado.

12. Harbor Group is a landlord as defined under Colorado law and at all times relevant to the subject matter of this action Harbor Group acted as the landlord and property manager for Arvada Village and all other Colorado properties where the Challenged Fees were charged and collected.

**Jurisdiction and Venue**

13. Jurisdiction is proper and relief is available under 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act).

14. Plaintiff Nesladek is a citizen of the State of Colorado, and Defendant Harbor Group is a citizen of the Commonwealth of Virginia, the State of New York, and the State of Texas.

15. The number of members of the proposed Plaintiff class is far greater than 100 because Harbor Group has approximately 2,721 rental units under management in Colorado.

16. The amount in controversy exceeds $5,000,000.00. On information and belief, Harbor Group charges each unit under its management in Colorado an average of more than $80 in Challenged Fees each month, totaling more than $2.6 million per year, or $7.8 million during the class period to date. Because Plaintiff, on behalf of the

class, seeks actual damages, including prejudgment interest, under C.R.S. § 6-1-113, the amount in controversy likely exceeds $7.8 million.

17. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted occurred in the State of Colorado including that the Arvada Village apartment complex is located in the City of Arvada in Jefferson County, Colorado and the other residential rental properties that Harbor Group manages and where it has employed its unlawful practices are in the State of Colorado.

## Common Factual Allegations

### I. The scope and structure of Harbor Group's junk fee scheme.

18. Harbor Group manages at least nine multi-family apartment complexes throughout Colorado and in total, Harbor Group manages approximately 2,721 rental units in Colorado.

19. During the class period, Harbor Group advertised apartment units to prospective tenants online, prominently showing a single price for monthly rent for each apartment floorplan.

20. Once a prospective tenant decided to rent a Harbor Group unit, but before they signed a lease, the prospective tenant was provided a standardized "Welcome Home" Letter that contained, *inter alia*, a list of "recurring monthly charges" not included in the advertised rent price. The "Welcome Home" Letter is the first communication mentioning separate fees that Harbor Group provides to prospective tenants.

21. Exhibit 1 is a fair and accurate copy of Harbor Group's uniform Welcome Home Letter that Harbor Group used with every tenant at Arvada Village. Harbor Group used substantially the same letter for all tenants at each of its Colorado properties.

22. The Welcome Home Letter does not adequately disclose the Challenged Fees. The Welcome Home Letter misleadingly lists a single static "Trash/Pest Control" fee when in fact Harbor Group charges its tenants for trash and pest control fees separately and the trash fee varies month-to-month. The Welcome Home Letter also does not disclose at all the Gas Reimbursement Fee or Common Area Electric Fee.

23. All of Harbor Group's properties in Colorado are subject to the same non-negotiable lease contract (the "Form Lease"), which is based on a template provided by the National Apartment Association.

24. Exhibit 2 is a fair and accurate copy of the Form Lease that Harbor Group uses with every tenant at Arvada Village and is substantially the same lease used by Harbor Group for all tenants in its Colorado properties.

25. The Form Lease is dense and consists largely of boilerplate terms and numerous addenda, including a "Utility and Services Addendum" (the "Utility Addendum") and "Pest Control Addendum," that together total more than seventy pages.

26. Because each Form Lease contains substantively identical provisions, most, if not all, Harbor Group tenants in Colorado are subject to essentially identical lease terms no matter the Harbor Group property where they reside.

27. The Challenged Fees are not fully and accurately disclosed to tenants until *after* they have both signed a lease and received their first monthly billing statement from Harbor Group. Although the Welcome Home Letter partially and inaccurately discloses a single "Trash/Pest Control" fee, the amount listed does not cover monthly trash and pest control fees and the Welcome Home Letter does not disclose the Gas Reimbursement Fee or Common Area Electric Fee at all.

28. Although Harbor Group failed to adequately disclose the Challenged Fees in its advertised rental prices, the Welcome Home Letter, or in the Form Lease, Harbor Group nonetheless assesses and seeks to collect the Challenged Fees from tenants for gas service, pest control, and common area electric service by sending them a billing statement with separate charges for each Challenged Fee on a monthly basis.

29. Harbor Group assesses and seeks to collect the Challenged Fees in the same unlawful manner from the majority, if not all, of its tenants.

30. Plaintiff Nesladek and class members paid the Challenged Fees to protect their interests in their leaseholds, including to avoid being subjected to eviction proceedings. Per the Form Lease, "[i]f you are delinquent paying any monetary amount . . . you will be in material violation of the Lease Contract and, all remedies under this Lease Contract and at law will be authorized, including eviction." (Ex. 2, p. 3 ¶ 6). Additionally, the Utility Addendum specifically states that "[t]he late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for

nonpayment, unless we are operating under a local, state, or federal voucher or subsidy program." (Ex. 2, p. 17 ¶ 3).

31. Therefore, Plaintiff Nesladek and other tenants at Harbor Group properties reasonably believed that if they did not pay the Challenged Fees, Harbor Group would have evicted them from their homes and deprived them of their property interest in their leaseholds. Thus, any payments made by Plaintiff and class members were involuntary and under duress due to the ever-present threat of eviction.

32. Harbor Group routinely serves eviction notices to its Colorado tenants for failure to pay one or more of the Challenged Fees, threatens eviction for nonpayment of the Challenged Fees, and files eviction suits in court seeking possession of the rental unit based in whole or in part on nonpayment of one or more of the Challenged Fees.

## II. Harbor Group fails to adequately disclose the Challenged Fees, misrepresents what tenants receive in exchange for monthly rent, and misrepresents the total rental price.

33. By advertising rental housing in exchange for a monthly rent amount, Harbor Group represents that prospective tenants will receive a suitable dwelling place in exchange for the payment of monthly rent.

34. Only later, after they have expended considerable time and resources, paid thousands of dollars in non-recoverable costs and fees, and signed a lease, do tenants learn that they will not receive a suitable dwelling place unless they also pay the Challenged Fees.

35. Accordingly, by advertising a monthly rental amount that does not include the Challenged Fees, Harbor Group misrepresents the characteristics and identity of the

product and services that will be provided in exchange for the payment of the advertised monthly rental amount.

36. Similarly, Harbor Group repeatedly misrepresents the true total price of its rental units by failing to disclose the Challenged Fees, which must be paid in addition to the advertised monthly rent in order to obtain or remain in a Harbor Group unit.

37. Harbor Group misrepresents the total price of a rental unit in several ways.

38. First, Harbor Group advertised a monthly rent that did not include the Challenged Fee amounts for its rental units in Colorado.

39. Second, Harbor Group did not fully and accurately disclose all of the Challenged Fees as part of the total monthly cost described in the Welcome Home Letter. (*See* Ex. 1).

40. And, while the Welcome Home Letter purports to describe the monthly costs and fees that will be charged to the tenant, it does *not* indicate or allude to the imposition of any charges for gas service and common area electric service. Rather, it suggests that Harbor will not directly impose such charges at all, as the Welcome Home Letter indicates tenants will be billed separately by Xcel for “electric and gas.” Further, while the Welcome Home Letter indicates there will be a $3.00 charge per month for “Trash/Pest Control,” Harbor Group actually charges both a $3.00 per month Pest Control fee *and* a separate trash removal fee of approximately $8.00 to $10.00 per month. The Welcome Home Letter does not specify the allocation formula or monthly amount that will be charged for any of the Challenged Fees. (*See* Ex. 1).

41. Third, Harbor Group fails to adequately disclose the Challenged Fees in the Form Lease, which neither authorizes the fees nor indicates that tenants bear any financial responsibility for gas service, pest control, or common area electric service. (*See* Ex. 2).

42. Instead, the Form Lease contains two contradictory provisions concerning utility payments. The first provision, located in section 7 of the Form Lease under the heading "Utilities," states, "We'll pay for the following items, if checked," and indicates that "[i]f any utilities are submetered for the apartment, or prorated by an allocation formula, we will attach an addendum to this Lease Contract in compliance with state agency rules or city ordinance." (*See* Ex. 2). The second provision, located in the Utility Addendum, states that "[r]esponsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility will be indicated below." (*See* Ex. 2).

43. The Utility Addendum further states that "[w]here the terms or conditions found in this Addendum vary or contradict any terms or conditions found in the Lease Contract, this Addendum shall control." (*See* Ex. 2).

44. The Utility Addendum lists twelve utilities with checkboxes next to different options for payment responsibility and pricing. For utilities where no billing will occur and no payment is owed, the checkboxes are left blank.

45. Looking at the utility provisions together, the Form Lease does not authorize Harbor Group to charge tenants any of the Challenged Fees.

46. For "gas service" the relevant box on the Utility Addendum is not checked, (*see* Ex. 2), and nothing in the Form Lease and addenda permit or authorize Harbor Group to charge tenants for gas service.

47. For "pest control," the relevant box on the Utility Addendum is not checked, (*see* Ex. 2), and nothing in the Form Lease and addenda permit or authorize Harbor Group to charge tenants for pest control.

48. For electric service, the Utility Addendum indicates that tenants will pay the service provider "directly" and does not indicate that charges will be calculated using any special "allocation method" to account for, *inter alia*, common area usage. (*See* Ex. 2). In the section of Utility Addendum concerning "metering/allocation method," no method is indicated for electric service. Nothing else in the Form Lease or addenda permit Harbor Group to charge tenants for common area electric service.

49. Harbor Group does not even partially disclose the fees for gas service and common area electric service until the time Harbor Group, using its sole and absolute discretion, causes them to be billed to the tenant, at which time they are billed as separate line items, apart from monthly rent.

50. This practice of gradually disclosing additional costs throughout the consumer's rental process (known as "drip pricing") is deceptive, unfair, and unavoidable for Harbor Group's tenants.

51. Plaintiff and the class members reasonably relied on Harbor Group's nondisclosure of this crucial information concerning the Challenged Fees in choosing to lease from Harbor Group.

52. As a result of Harbor Group's drip pricing, the actual amounts that Harbor Group charges for each Challenged Fee are not revealed until the time a charge is billed to the tenant—after the tenant has already expended significant time and resources, paid thousands of dollars in nonrefundable fees, and even signed a binding lease agreement.

53. The belated disclosure of these fees—when they are disclosed at all—also undermines fair competition. Prospective tenants cannot meaningfully compare prices for apartment rentals when a significant portion of their monthly rent consists of hidden charges. This may lead tenants to pay more than they otherwise would have for monthly rent, even when they cannot afford the difference in price.

54. Even at the time of billing, the disclosure of the Challenged Fees is inadequate. Harbor Group does not disclose the nature and purpose of the Challenged Fees, whether the Challenged Fees will continue to be charged on a monthly basis, or whether the charges will vary month to month.

55. And by listing the Challenged Fees as ledger items separate and apart from monthly rent (known as "partitioned pricing"), Harbor Group continues to misrepresent both the total price of the rental unit and the characteristics and identity of the product and services received in exchange for the payment of monthly rent.

## III. Harbor Group misrepresents the nature and purpose of the Challenged Fees, which actually serve as profit centers and shift Harbor Group's costs of doing business onto tenants.

56. Harbor Group obfuscates the nature and purpose of the Challenged Fees, including the nature of the services tenants purportedly receive in exchange for the fees and the actual cost of any service provided.

57. The Challenged Fees function as a profit center for Harbor Group. That is, the amount charged to tenants exceed Harbor Group's costs to provide the specified service and pad Harbor Group's bottom line.

58. Upon information and belief, the Challenged Fees charged to tenants overcharge the actual costs billed to Harbor Group by the utility and/or service providers.

59. On information and belief, Harbor Group's cost for pest control is lower than the $3.00 per unit per month it charges tenants.

60. On information and belief, Harbor Group charges tenants for pest control services even if pest control services are not provided during a given month.

61. On information and belief, Harbor Group's monthly costs for gas and electric charges are less than the amount it charges tenants.

62. Harbor Group's junk fees do not provide tenants with any special benefits or services beyond those the company is required to provide as a landlord and that its tenants, including Plaintiff, reasonably expected to have been provided as consideration solely for their monthly rent payments. In other words, these junk fees serve no legitimate purpose and constitute a double billing for consideration included in its tenants' monthly rent. These fees mislead tenants with respect to the nature and purpose of the charges.

63. Harbor Group charges tenants the Challenged Fees to cover its basic overhead costs, including utilities and maintenance for areas within its managed properties beyond the areas leased (i.e., apartments) and common areas, charging tenants for the utilities of spaces not even available to its respective tenants, such as Harbor Group's office space and vacant units and for operating expenses such as time spent by its staff on administrative tasks.

64. Similarly, Harbor Group's imposition of the Pest Control fee improperly shifts the cost of compliance with the warranty of habitability onto its tenants.

65. Colorado's Warranty of Habitability law requires that landlords provide:

> (VII) Common areas and areas under the control of the landlord that are kept reasonably clean, sanitary, and free from all accumulations of debris, filth, rubbish, and garbage and that have appropriate extermination in response to the infestation of rodents or vermin; [and]
>
> (VIII) Appropriate extermination in response to the infestation of rodents or vermin throughout a residential premises….

C.R.S. § 38-12-505(1)(b)(VII)-(IX).

66. With very narrow exceptions limited to single family homes, *see, e.g.*, C.R.S. § 38-12-506, Colorado's warranty of habitability law prohibits any waiver or modification of its terms, including shifting landlord duties onto tenants. *See* C.R.S. §§ 38-12-503(5).

67. Through its imposition of mandatory Pest Control fees, Harbor Group shifts the cost of compliance with the warranty of habitability onto its tenants. It charges these fees beyond the amount charged for monthly rent, the cost of which should afford

tenants the habitable dwelling place, free from rodents and vermin, that Harbor Group must provide under the law.

68. The Pest Control fees are void and unlawful because they seek to improperly modify the warranty of habitability by, *inter alia*, shifting the burden of compliance onto tenants.

69. The imposition of the Pest Control fees deceptively and unfairly misled consumers into believing that the costs are assessed for services provided beyond the habitable dwelling place provided in exchange for the payment of monthly rent.

### IV. Harbor Group exploits its role in procuring and billing for certain services.

70. Plaintiff and class members are not a party to the third-party vendor contracts and have no recourse other than to place their trust, confidence, and reliance in Harbor Group. Harbor Group has the sole authority and discretion to select and approve all utility and services providers who may provide services to tenants at their Colorado properties, select and change billing and allocation methods, and to impose charges on its tenants under the threat of eviction. Due to the lack of transparency surrounding these fees, Harbor Group adds illegal markups on essential services.

71. To date, Harbor Group has attempted to avoid scrutiny and accountability for these practices by hiding and failing to adequately disclose its fees and by taking advantage of the power imbalance inherent in the landlord-tenant relationship: A relationship through which, under Colorado law, Harbor Group acts as a fiduciary.

72. Harbor Group's status as a fiduciary is cemented by its conduct giving rise to this action. Namely, Harbor Group makes itself the responsible party for procuring

and billing for common area utilities, gas service, and pest control and then proceeds to abuse that position of trust, superior information, and bargaining power by marking-up the costs of such utilities and services prior to billing tenants for them so as to reap an additional, obscured source of profit and income at its tenants' expense.

73. Relative to the investor entities that own the properties that Harbor Group manages, Harbor Group has control, responsibility, and discretion over engaging with third-party vendors to provide essential services to tenants, including utilities, determining the amount to collect, and collecting these fees.

74. Plaintiff anticipates the need to amend her Complaint following a period of discovery concerning Harbor Group's other standard practices and charges.

**Factual Allegations Specific to Named Plaintiff Nesladek**

75. On or around early November 2024, Plaintiff Nesladek viewed apartment listings on Harbor Group's website, which included an advertised monthly rent amount varying by floor plan. Sometime after signing a lease with Harbor Group and moving into a Harbor Group apartment, Plaintiff Nesladek observed changes to Harbor Group's website that included additional disclosures concerning the Challenged Fees.

76. On November 21, 2024, Harbor Group sent Plaintiff Nesladek a Welcome Home Letter (*see* Ex. 1). On or around that date, Harbor Group charged, and Plaintiff Nesladek paid, a non-refundable $26.00 application fee and a $185.00 administrative fee in connection with the processing of her rental application.

77. The Welcome Home Letter that Harbor Group provided to Plaintiff Nesladek stated:

> **Utilities** - To ensure that your apartment home is ready on your move-in date, you are responsible for contacting and setting up your services with the utility companies listed on the following page, such as electricity, phone and cable. You can setup services by contacting the service providers in person with the information provided below. It is recommended that you contact them several days ahead of move-in to ensure service is connected on your move-in day. In the event utilities are not put in your name, a $75.00 processing fee will be assessed each time a utility bill is generated to you from the property.
>
> (*See* Ex. 1).

78. The only utility company "listed on the following page" is "Xcel" and the utilities provided by Xcel are "Electric and Gas." (*See* Ex. 1).

LOCAL UTILITY COMPANIES

| Utility Company | Service Provided | Phone Number |
|---|---|---|
| Xcel | Electric and Gas | 1 (800) 895-4999 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

79. On November 21, 2024, Plaintiff Nesladek and Harbor Group executed a Form Lease for Nesladek to rent and occupy Apartment No. 89103 at Arvada Village with a move-in date of November 25, 2024 (*see* Ex. 3).

80. On November 25, 2024, Nesladek moved into unit Apartment No. 89103.

81. Due to the filthy and unacceptable condition of Apartment No. 89103 upon moving in, Plaintiff Nesladek requested a transfer to a different apartment at Arvada Village and Harbor Group agreed to the transfer. Plaintiff Nesladek reached an agreement with Harbor Group to relocate to Apartment No. 81104, which she did on December 5, 2024.

82. Harbor Group did not provide a new or amended Welcome Home Letter to Plaintiff Nesladek prior to or upon her transferring units.

83. On December 5 and 6, 2024, Plaintiff Nesladek and Harbor Group executed a Form Lease (the "December 5, 2024 Form Lease") for Nesladek to rent and occupy Apartment No. 81104 at Arvada Village with a move-in date of November 25, 2024. (*See* Ex. 2). Plaintiff Nesladek signed the Form Lease on December 5, 2024, and Harbor Group executed the Form Lease on December 6, 2024. *Id.* The terms of the second Form Lease are substantially identical to the first Form Lease.

84. The December 5, 2024 Form Lease for Apartment No. 81104 superseded the November 21, 2024 Form Lease for Apartment No. 89103.

85. The December 5, 2024 Form Lease did not authorize Harbor Group to charge or collect from Plaintiff Nesladek for gas service, pest control, or an "Electric Recovery" fee.

86. Instead, the December 5, 2024 Form Lease contained a Utility Addendum indicating that neither gas service nor pest control would be billed to Nesladek:

c) **Gas** service to your apartment will be paid by you either:
❑ directly to the utility service provider; or
❑ gas bills will be billed by the service provider to us and then allocated to you based on the following formula: ________________
❑ If flat rate is selected, the current flat rate is $____________ per month.
❑ 3rd party billing company if applicable ________________________________________

**If your Gas service is sub-metered and charged by Owner, a separate "Gas and Electric Sub-metering Addendum" is attached hereto and incorporated by reference. Any conflicting terms of the Gas and Electric Sub-metering Addendum shall supersede the terms of this Utility and Services Addendum.**

j) **Pest Control** service to your apartment will be paid by you either:
❑ directly to the utility service provider; or
❑ pest control bills will be billed by the service provider to us and then allocated to you based on the following formula: __________
❑ If flat rate is selected, the current flat rate is $____________ per month.
❑ 3rd party billing company if applicable ________________________________________

87. The December 5, 2024 Form Lease indicated that if fees for gas service were to be sub-metered and charged to the tenant, Harbor Group would provide a separate "Gas and Electric Sub-metering Addendum."

88. The December 5, 2024 Form Lease did not include and Harbor Group and Plaintiff Nesladek never signed or agreed to a "Gas and Electric Sub-metering Addendum."

89. For other utilities, such as water service, sewer service, trash service, and stormwater service, the Utility Addendum contained checked boxes providing that the services would be "billed by the service provider to [Harbor Group] and then allocated to [Nesladek] based on the following formula" and that Harbor Group would use a "3rd party billing company" called "YES Energy." (*See* Ex. 2).

90. Nowhere else did the December 5, 2024 Form Lease authorize Harbor Group to charge Plaintiff Nesladek for gas service or pest control.

91. The Utility Addendum and Form Lease provide Harbor Group with sole and absolute discretion to change utility and service allocation methods and third-party billing companies:

> 2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes. Under any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees on unregulated utilities and services. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods or third-party billing companies, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

> L. All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

(*See* Ex. 2).

92. Despite the December 5, 2024 Form Lease not authorizing pest control charges or fees, from January 2025 through her vacating the unit in July, 2025, Harbor Group charged Plaintiff Nesladek a $3.00 “Pest Control Service” fee every month by billing her and adding the charges to her tenant ledger, which Nesladek paid.

93. Despite the December 5, 2024 Form Lease not authorizing gas service charges or fees, in February 2025, Harbor Group charged Nesladek a $68.00 “Gas Reimbursement” fee; in March 2025, Harbor Group charged Nesladek a $92.03 “Gas Reimbursement” fee; in April 2025, Harbor Group charged Nesladek a $71.72 “Gas Reimbursement” fee; in May 2025, Harbor Group charged Nesladek a $56.37 “Gas Reimbursement” fee; in June 2025, Harbor Group charged Nesladek a $47.65 “Gas Reimbursement” fee; and in July 2025, Harbor Group charged Nesladek a $38.78 “Gas Reimbursement” fee, all of which Nesladek paid.

94. Seemingly recognizing the invalidity of the “gas reimbursement” and “pest control” charges, on June 25, 2025, Harbor Group credited Plaintiff Nesladek’s tenant ledger for the cumulative amount of those charges through June 2025 ($288.12 for “Gas Reimbursement” charges and $27.40 for “Pest Control” charges).

95. Despite crediting Plaintiff Nesladek’s account for those charges, Harbor Group continued to assess these unlawful charges on June 26, 2025 and in July 2025.

96. The December 5, 2024 Form Lease also did not authorize Harbor Group to charge or collect from Plaintiff Nesladek an "Electric Recovery" fee.

97. The "Electric Recovery" fee is a charge for common area electricity usage in Arvada Village.

98. The only relevant reference to common area utility fees in the December 5, 2024 Form Lease is in the Utility Addendum, which stated "[u]nder any allocation method, Resident may be paying for part of the utility usage in common areas or in other residential units as well as administrative fees on unregulated utilities and services." (*See* Ex. 2). However, an "allocation method" is not selected for electric service and nothing else in the Form Lease or addenda permit Harbor Group to charge Plaintiff Nesladek for common area electric service.

99. Despite the December 5, 2024 Form Lease not authorizing such charge, in February 2025, Harbor Group charged Nesladek a $17.86 "Electric Recovery" fee; in March 2025, Harbor Group charged Nesladek a $19.24 "Electric Recovery" fee; in April 2025, Harbor Group charged Nesladek a $18.42 "Electric Recovery" fee; in May 2025, Harbor Group charged Nesladek a $14.69 "Electric Recovery" fee; and in June 2025, Harbor Group charged Nesladek a $11.89 "Electric Recovery" fee; all of which Nesladek paid.

100. Plaintiff Nesladek was assessed and paid the Challenged Fees every month during her tenancy. She paid to protect her interest in her leasehold.

101. Despite Plaintiff Nesladek vacating the unit and her lease terminating in July 2025, Harbor Group has continued to charge Nesladek for "Gas Reimbursement" and "Electric Recovery" every month through at least November 2025.

102. During her tenancy, Plaintiff Nesladek contacted Harbor Group to request an explanation of why she was being charged for gas, pest control, and electricity and she told Harbor Group that "[i]t is impossible for me to determine how much gas I have used, how much gas I am being charged for, or what exactly I am being charged for at all based on my lease and the bills I've received."

103. Harbor Group responded to Plaintiff Nesladek's inquiry and acknowledged that her lease did not authorize the gas or pest control fees. Harbor Group also stated that the "Electric Recovery [fee] was implemented in [*sic*] January 01, 2025," *after* Nesladek had signed her lease.

104. Nesladek did not agree to or sign any separate agreement authorizing the Electric Recovery fee. Instead, Harbor Group unilaterally implemented the fee without prior notice or authorization.

105. Consistent with the terms of the Form Lease, Plaintiff Nesladek believed that if she did not pay the Challenged Fees, Harbor Group would have evicted her from her home for failing to pay the Challenged Fees and so Nesladek paid the Challenged Fees under threat of eviction.

**Class Action Factual Allegations**

106. Plaintiff Nesladek brings this action in accordance with Federal Rule of Civil Procedure 23 on behalf of herself and a Challenged Fee Class defined as follows:

> All persons who: (1) leased a residential rental unit in Colorado from Harbor Group within the relevant statute of limitations, (2) using Harbor Group's Form Lease, and (3) were assessed any of the Challenged Fees.

107. The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's principals, subsidiaries, parents, successors, predecessors, contractors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assignees of any such excluded persons.

108. Plaintiff Nesladek anticipates the need to amend the definitions following a period of appropriate class-based discovery.

109. **Numerosity:** The exact number of Class Members is unknown and not available to Plaintiff Nesladek at this time, but individual joinder is impracticable. On information and belief, Harbor Group has charged the Challenged Fees to thousands of tenants who fall into the Class as defined. The number of Class Members and class membership can be identified through entirely objective criteria, including Harbor Group's business records and tenant payment ledgers.

110. **Typicality:** Plaintiff Nesladek's claims are typical of the claims of other members of the Class in that Plaintiff and the members of the Class were assessed the same allegedly unlawful charges and sustained the same legal injuries and damages

arising out of Harbor Group's uniform wrongful conduct. If Plaintiff Nesladek has an entitlement to relief, so do the rest of the Class Members.

111. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions, including class actions against landlords and class actions seeking damages and declaratory relief arising out of form lease agreements. Neither Plaintiff nor her counsel has any interest in conflict with or antagonistic to those of the Class, and Harbor Group has no defenses unique to Plaintiff.

112. **Commonality and Predominance:** There are questions of law and fact common to the claims of Plaintiff and the Class and those questions will drive the litigation and predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to, the following:

a. Whether the Challenged Fees are unlawful profit centers;
b. Whether the Challenged Fees should have been disclosed prior to the presentation of the Form Lease or the issuance of monthly billing statements;
c. Whether the itemization of the Challenged Fees should have been disclosed at any point before or during a resident's tenancy;
d. Whether Harbor Group provided the required disclosure or itemization of costs;
e. Whether the Class is entitled to equitable relief in the form of an accounting;
f. Whether the Class is entitled to injunctive or declaratory relief;
g. Whether the Class is entitled to damages; and
h. Whether the Class is entitled to other relief including reasonable attorneys' fees, costs, and pre- and post-judgment interest.

113. **Conduct Similar Towards All Class Members:** By committing the acts alleged in this pleading, Harbor Group has acted or refused to act on grounds

substantially similar towards all members of the Class so as to render certification of the Class for declaratory relief appropriate under Rule 23(b)(2).

114. **Superiority & Manageability:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Class will likely be relatively small when compared to the burden and expense of individual prosecution of the complex litigation necessitated by Harbor Group's actions. It would be virtually impossible for the individual members of the Class to obtain effective relief from Harbor Group's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a certified class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Separate lawsuits pose a risk of contradictory decisions on key legal and factual issues impacting every Class member. Also, there are no pending governmental actions against Harbor Group for the same conduct, and any such action would be less preferable to Class Members who have a vested interest in seeing the case pursued in a way that maximizes the class's recovery.

**First Cause of Action**
**Violation of Colorado Consumer Protection Act (CCPA)**
**C.R.S. § 6-1-101 *et seq.***
**(On Behalf of Plaintiff and the Class)**

115. Plaintiff Nesladek restates and realleges the foregoing allegations.

116. Under the Colorado Consumer Protection Act, “a person engages in a deceptive trade practice when, among other acts, in the course of the person's business, vocation, or occupation, the person”:

> (i) Advertises goods, services, or property with intent not to sell them as advertised;
> (*l*) Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;
> (u) Fails to disclose material information concerning goods, services or property which information was known at the time of the advertisement or sale if such failure was to disclose such information was intended to induce the consumer to enter into a transaction; [and]
> (rrr) Either knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice.

C.R.S. § 6-1-105(1).

117. In violation of this subsection, Harbor Group knowingly or recklessly engaged in unfair, deceptive, and unconscionable acts and practices.

***Unfair and Deceptive Conduct***

118. Defendant knowingly or recklessly committed unfair and deceptive acts and practices by misrepresenting the existence, nature, purpose, and extent of the fees it would charge and collect against Plaintiff and class members, including the Challenged Fees. Harbor Group did so by charging the Challenged Fees and by inflating the amounts charged to tenants in relation to its actual costs so as to turn its Challenged Fees into additional profit centers.

119. It is an unfair trade practice for Defendant to violate Colorado law prohibiting exempted master meter operators from profiting from the delivery of utility

services. Under Colorado's Public Utility Law, a master meter operator ("MMO") is "any person who purchases gas or electric service from a regulated public utility for the purpose of delivery of such service to end users." C.R.S. § 40-1-103.5(1). An MMO is only exempt from rate regulations if they do "not charge the end users, as part of its billing for utility service, for any costs in addition to the actual cost billed to the MMO by the serving utility, including without limitation costs of construction, maintenance, financing, administration, metering, or billing for the utility distribution system owned by the MMO." C.R.S. 40-1-103.5(1). (*see also* 4 Colo. Code Regs. § 723-4:4803 "a MMO shall not resell the [gas] services provided by a serving utility to the MMO for profit; and 4 Colo. Code Regs. § 723-4:4803 "a MMO shall not resell electricity provided by the serving utility for profit."). Defendant purchased both gas and electric utility services from providers and delivered them to tenants as the end users. Through the setting and collection of the gas charges and "Electric Recovery" fee, Defendant is selling the utility services for profit.

***Unconscionable Acts***

120. Defendant has also acted unconscionably.

121. Procedurally, the Form Lease is entirely drafted by Defendant, is non-negotiable and presented on a take-it-or-leave-it basis.

122. The Form Lease is presented to tenants, including Plaintiff, to review and sign in an electronic format that does not provide any capability for tenants to modify or add to the lease provisions. The electronic presentation of the Form Lease only permits a tenant to review and sign the Form Lease.

123. The Form Lease is provided to prospective tenants for review after they have already paid hundreds of dollars in application fees, administrative fees, and potentially additional amounts, like the first month's rent, any pro-rated rent, and any security deposit(s).

124. The Form Lease itself routinely exceeds 75-pages in length, and to the extent that any disclosure is made by Harbor Group as to the fees included in the Challenged Fees, it is buried within dense text written in "legalese."

125. Even with the limited disclosures as to what fees "may" be included in the Utility Fees, nowhere in the lease or in any other documents does Harbor Group actually and fully disclose the full itemization of the Individual Utility Fees, Common Area Utility Fees, Administrative Fees.

126. Harbor Group also fails to disclose the utility fees actually billed to Harbor Group by third-party vendors, which is the amount that per the explicit terms of the lease should have been charged to tenants.

127. Substantively, the Form Lease purports to allow the assessment of fees that are unlawful and grossly exceed any actual costs for which they are nominally being imposed.

128. Moreover, these charges grossly exceed Defendant's actual costs and amount to additional rent. Assessing such mark-ups is particularly one-sided because they are not disclosed before the Form Lease is presented and prospective tenants have already invested hundreds (if not thousands) of dollars pursuing the unit.

***Substantial and Significant Public Impact***

129. To the extent required by Colorado law, Plaintiff alleges that Defendant's unlawful conduct and other violations of the CCPA set forth above significantly impacts the public.

130. The number of consumers directly affected by the challenged practices is significant and growing. These fees are charged for all of or the majority of Harbor Group's nine properties, covering over 2,700 units. Each of these properties may have had many tenants who paid the fees over months or years. The number of Colorado consumers who paid these deceptive and unfair fees is certainly in the thousands.

131. These consumers, including Plaintiff and class members, are often substantially less sophisticated than Harbor Group. They certainly have less bargaining power. Harbor Group holds all the cards, and all the power in the consumer transaction, particularly when the fees are never fully disclosed.

132. Plaintiff Nesladek is not an attorney and is therefore untrained in housing, consumer or contract law. Furthermore, Plaintiff was unrepresented by counsel at the time of signing his lease. As a result, Plaintiff was unaware of the intricacies contained within the legalese and fine print of the Form Lease. As a corporate entity that specializes in property management, Harbor Group is significantly more sophisticated than Plaintiff and the average tenant concerning the responsibility and obligations of landlords under Colorado law. Harbor Group almost certainly had the assistance of counsel in preparing and reviewing its Form Lease before Plaintiff, or any other tenant in Colorado, was offered to sign it.

133. Colorado renters face an affordability crisis, and Harbor Group's Challenged Fees directly make leasing less affordable for thousands of Coloradans. Further, Harbor Group's failure to adequately disclose the Challenged Fees undermines the bargaining power of renters and market competition in the rental housing market, thereby further inflating rental housing costs in the state.

***Class Relief Sought***

134. Defendant has engaged in or caused others to engage in the deceptive trade practices set forth above, and Plaintiff and the Class members are consumers or potential consumers of Defendant's rental units.

135. Pursuant to section 6-1-113(2.9), C.R.S., Plaintiff seeks, on behalf of herself and the Class, all actual damages suffered as a result of the deceptive trade practices in amounts to be proven at trial, injunctive relief allowed by law, and an award of reasonable attorneys' fees and costs.

**Second Cause of Action**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

136. Plaintiff Nesladek restates and realleges the foregoing allegations.

***Breach of Contract***

137. Every Form Lease is a contract that establishes the responsibilities and obligations of both the landlord and tenant signors.

138. The Form Lease provisions outline what amounts a tenant will be charged for before, after, and during the tenancy.

139. The Form Lease has two conflicting provisions that outline who will pay for utilities. The first provision is within the body of the Form Lease under the subheading "Utilities," and the second is in the Utility Addendum.

140. In the body of the Form Lease, Harbor Group states:

> **7. UTILITIES.** We'll pay for the following items, if checked:
> ❑ water ❑ gas ❑ electricity ❑ master antenna
> ❑ wastewater ❑ trash ❑ cable TV
> ❑ other ______________________________

(*See* Ex. 2).

141. In the Utility Addendum, Harbor Group identifies who is "responsib[le] for payment of utilities" and indicates that water, sewer, trash, and stormwater will be "billed by the service provider to [Harbor Group] and then allocated to [Nesladek] based on the following formula" and that Harbor Group would use a "3rd party billing company" called "YES Energy." *Id.*

142. Harbor Group breached the contract by charging Plaintiff Nesladek and other class members the Challenged Fees.

***Breach of Covenant of Good Faith and Fair Dealing***

143. Every Form Lease is a contract that contains an implied covenant of good faith and fair dealing.

144. The covenant of good faith and fair dealing requires that each party to the contract, to the extent the contract affords them discretion, not abuse that discretion or act in a manner so as to not frustrate the other side's ability to enjoy the benefit of the bargain and honor the reasonable expectations of the parties.

145. Under the Form Lease, Harbor Group has the ability to determine which charges get billed in any particular month and the manner by which those charges will be pursued.

146. Defendant has abused its discretion by grossly overcharging for its actual costs and/or double billing for actual costs that Colorado law requires be included in a tenant's monthly rent. Only Defendant knows its actual costs, and by turning these charges into profit centers Defendant makes it more difficult for tenants to make rent, enjoy their tenancies, and keep themselves and their families housed.

147. A corollary to the implied covenant of good faith and fair dealing is an implied duty of accurate billing. Defendant has breached that implied duty by assessing the fees and inflating those fees without a legal basis for doing so.

148. As a result of these breaches, Defendant has caused Plaintiff and class members actual damages.

149. Plaintiff seeks, on behalf of herself and the Class, actual damages in amounts to be proven at trial plus costs, pre- and post-judgment interest, and such additional relief as the Court deems necessary and just.

**Third Cause of Action**
**Alternative Claim for Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

150. Plaintiff Nesladek restates and realleges the foregoing allegations.

151. In the event the Form Lease is found unenforceable or otherwise fails, or that the junk fees fall outside the contract, Defendant has been unjustly enriched through the charging and collection of junk fees.

152. Plaintiff and other tenants have conferred benefits on Defendant in the form of payment for the unlawful Challenged Fees under circumstances where Defendant should not be permitted under principles of equity and good conscience to retain such fees.

153. Plaintiff, on behalf of herself and the Class, pray for an Order of Judgment disgorging Defendant of all amounts collected and retained as a result of the Challenged Fees and returning such fees to the Plaintiff and the other Class Members and for such additional relief as the Court deems necessary and just.

**Fourth Cause of Action**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

154. Plaintiff Nesladek restates and realleges the foregoing allegations.

155. Landlords and tenants are included "in the class of persons between whom the relation is of a fiduciary nature, so as to require the utmost degree of good faith in all transactions between them." *Hurt v. Schneider*, 156 P. 600, 602 (Colo. 1916).

156. Harbor Group, as a landlord, acted as a fiduciary of Plaintiff and the class members with respect to Harbor Group's role of managing, billing and collecting amounts assessed for utilities charges and then paying those fees to the respective service providers.

157. Defendant, and not Plaintiff or the proposed class members, is party to all contracts and agreements with utility and service providers.

158. Defendant has exclusive possession and control over all records concerning the actual cost of utilities and any administrative costs associated with providing utilities to Plaintiff and proposed class members.

159. Through the fee structure established through Defendant's Form Lease, Plaintiff and class members placed their trust, confidence and reliance in Harbor Group.

160. Defendant was entrusted to act for the benefit of or in the interests of Plaintiff and the proposed class members and had the legal authority to do so with respect to properly setting up and maintaining essential utility services as well as properly collecting the funds from tenants to pay service providers.

161. Defendant had a fiduciary duty to act with good faith, loyalty, and primarily for the benefit of Plaintiff and the proposed class members in connection with the utility fees.

162. Defendant breached its fiduciary duty to Plaintiff and the proposed class members by failing to disclose material information about the charges it would assess and collect from Plaintiff and the proposed class members and by imposing and profiting off of excess or improper fees.

163. Plaintiff suffered injuries, damages, and losses which were caused by Defendant's breaches of fiduciary duty, including increased out of pocket costs, excess or improper fees and charges paid, pain and suffering, and other damages.

164. Due to Defendant's exclusive control over billing and contract information, Plaintiff and class members have no way to determine their damages.

165. "Although an accounting is an 'extraordinary remedy,' it may be ordered if the 'plaintiff [is unable] to determine how much, if any, money is due him from another.'" *Andrikopoulos v. Broadmoor Mgmt. Co.*, 670 P.2d 435, 440 (Colo. App. 1983) (citing *Bradshaw v. Thompson*, 454 F.2d 75 (6th Cir.1972)).

166. Therefore, Plaintiff and the proposed Class Members seek an Order of Accounting.

167. Plaintiff and the proposed Class Members seek to recover all actual and consequential damages, and special damages, including exemplary damages and pain and suffering, or, alternatively, to disgorge Defendant of all profits resulting from Defendant's breach of fiduciary duty plus pre- and post-judgment interest, reasonable attorneys' fees, and costs of suit and such other relief as the Court deems necessary and just.

**Fifth Cause of Action**
**Declaratory Judgment**
**F.R.C.P. 57 and 28 U.S.C. § 2201**
**(On Behalf of Plaintiff and the Class)**

168. Plaintiff Nesladek restates and realleges the foregoing allegations.

169. Under 28 U.S.C. § 2201 "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

170. Under C.R.S. § 13-51-105, "Courts of record within their respective jurisdictions have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."

171. Indeed, under Colorado law:

> Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

C.R.S. § 13-51-106.

172. Plaintiff and the Class members are interested under their Form Lease agreements, which are contracts, and they may have determined any question of construction or validity arising under their lease agreements.

173. Based on the foregoing violations of Colorado statute, breaches of contract, and other causes of action, Plaintiffs seek an Order of Judgment finding and declaring the following:

a. That Defendant's charging of and markups on mandatory fees not adequately disclosed in the advertised rent, Form Lease, or Welcome Home letter, violates the CCPA;

b. That Defendant's imposition of mandatory fees not authorized in the Form Lease constitutes a breach of contract;

c. That Defendant, by charging pest control services fees, unlawfully shifts its burden under the Warranty of Habitability to ensure a premises free of pests;

d. That Defendant has breached the implied covenant of good faith and fair dealing;

e. That Defendant has been unjustly enriched through the charging and collection of the Challenged Fees and should be disgorged of such monies;

f. That Defendant breached its fiduciary duty to its tenants by imposing and charging the inadequately disclosed, marked up, and impermissible Challenged Fees; and

g. That the Plaintiff and Class member are entitled to damages and injunctive relief barring the continued charging and collection of the Challenged Fees.

## Prayer for Relief

Plaintiff, on behalf of herself and all other Class Members, prays for an Order of Judgment:

A. Certifying the Class as set forth above, appointing Ashley Nesladek as the Class Representative and appointing her counsel as Class Counsel;

B. Awarding actual damages in an amount to be proven at trial for all breaches of contract and breaches of the covenant of good faith and fair dealing;

C. Awarding actual damages in an amount to be proven at trial, plus injunctive relief prohibiting further collection or negative credit reporting of such amounts, reasonable attorneys' fees and costs for all violations of the CCPA and contract.

D. In the alternative, requiring that Defendant be disgorged of all ill-gotten gains and other sums that have led to Defendant's unjust enrichment, in amounts to be proven at trial, for Defendant's charging of the unlawful junk fees;

E. Ordering an accounting so that Plaintiff and Class Members can determine the amount due to them.

F. Requiring that all damages be paid into a common fund for the benefit of the Class;

G. Awarding pre-judgment interest and post-judgment interest against Defendant at the 18% annually compounding rate provided in the contract, on all sums awarded to Plaintiff and Class Members;

H. Awarding Plaintiff and Class Members their reasonable attorneys' fees and expenses, to be paid from the common fund; and

I. For such other and further relief as the Court deems reasonable, necessary, and just.

Dated: April 20, 2026.

*<u>/s/ Spencer Bailey</u>*

**Spencer Bailey** (#56201)
Justice for the People Legal Center
501 S. Cherry St., Suite 1100
Denver, CO 80246
(720) 248-8697
spencer@justiceforthepeoplecenter.org

Benjamin G. DeGolia (#55737)
DeGolia Law P.C.
2701 Lawrence St.
Denver, CO 80205
(303) 210-0211
benjamin@degolialaw.com

Brianne Power (#53730)
Towards Justice
303 E. 17th Avenue, Suite 400
Denver, CO 80203
(720) 882-5122
brianne@towardsjustice.org

*Attorneys for Plaintiff Ashley Nesladek*